U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2026 APR 14  PM 2: 59

CLERK

BY_____ *lhw*
DEPUTY CLERK

HAMILTON MANAGING AGENCY              )
LIMITED and ANTARES MANAGING         )
AGENCY LIMITED,                      )
                                     )
        Petitioners,                 )
                                     )
        v.                           )     Case No. 2:25-mc-00079-cr
                                     )
ICI MUTUAL INSURANCE COMPANY,        )
RRG,                                 )
                                     )
        Respondent.                  )

**OPINION AND ORDER
DENYING THE REINSURERS' PETITION TO VACATE ARBITRATION
AWARD AND GRANTING ICIM'S CROSS-PETITION TO CONFIRM
ARBITRATION AWARD, CONFIRMING ARBITRATION AWARD,
ATTORNEY'S FEES, AND COSTS, AND GRANTING ICIM PRE-JUDGMENT
AND POST-JUDGMENT INTEREST**
(Docs. 1, 16)

On May 30, 2025, Hamilton Managing Agency Limited and Antares Managing Agency Limited (the "Reinsurers") filed a petition to vacate an arbitration award. (Doc. 1.) On July 14, 2025, ICI Mutual Insurance Company ("ICIM") opposed the petition, (Doc. 15), and the Reinsurers replied on August 15, 2025. (Doc. 28.) On July 14, 2025, ICIM filed a cross-petition to confirm the arbitration award.[1] (Doc. 16.) On August 15, 2025, the Reinsurers opposed the cross-petition,[2] (Doc. 27), and ICIM replied on September 5, 2025. (Doc. 30.) The court heard oral arguments on November 10, 2025, at which point the court took the pending petition and cross-petition under advisement.

The Reinsurers are represented by Dana M. Horton, Esq., and Erica J. Kerstein,

---

[1] ICIM filed a joint memorandum of law in support of its cross-petition and in opposition to the Reinsurers' petition.

[2] The Reinsurers filed a joint memorandum of law in opposition to ICIM's cross-petition and in reply in support of its petition.

Esq. ICIM is represented by Ira J. Belcove, Esq., and Kevin M. Henry, Esq.

## I.    Factual and Procedural Background.

### A.    The Insurance Policy.

ICIM issued a Directors and Officers/Errors and Omissions liability insurance policy (the "ICIM Policy") to an entity (the "Policyholder" or the "Company") for the policy period of July 31, 2019, to July 31, 2020. The ICIM Policy was a primary-level policy with a $100 million limit of liability over a per-claim deductible of $2.5 million. The ICIM Policy provided coverage for, *inter alia*, "Costs of Correction[,]" defined as:

> [T]he following amounts where reasonably and necessarily incurred to correct any Unrealized Liability: (1) direct compensatory payments by the Company to "recipients of the Company's services" or to "shareholders of any Company that is a Fund" (as referenced in Section III.R), and (2) direct costs or expenses incurred by the Company solely to calculate and deliver the amount of such compensatory payments, but not including salaries, wages, overhead, or benefit expenses associated with Directors, Officers[,] or employees of the Company.

(Doc. 1-3 at 6, ¶ III.D.) It defined "Unrealized Liability" as:

> [A]ny situation which arises from a Wrongful Act committed, in the ordinary course of the Company's operations, by the Company or by persons for whose Wrongful Acts the Company is legally responsible, which situation, if not corrected, would automatically have resulted in legal liability on the part of the Company to any recipients of the Company's services as designated in Section V.Q (or in any endorsement amending such Section) or to shareholders of any Company that is a Fund[,] provided that if a Claim for such Wrongful Act had been made against the Company as of the date the situation was corrected, such Claim would have resulted in Loss payable by the Company and not otherwise excluded under this Policy.

*Id.* at 8, ¶ III.R. "Wrongful Act" was defined as "any Negligent Act, Error[,] or Omission committed or alleged to have been committed by the Company or by persons for whose Negligent Acts, Errors[,] or Omissions the Company is legally responsible (including employees acting within the scope of their employment)." *Id.* at ¶ III.S.

The ICIM Policy contained a "Prior Acts Exclusion" clause that provided ICIM is not liable "to make any payment for any Loss in connection with any Claim made against, or any Costs of Correction in connection with[,] any Unrealized Liability . . .

where such Claim or Unrealized Liability is based upon, arises out of, directly or indirectly results from, is in consequence of, or in any way involves any Wrongful Act committed prior to" a redacted date. *Id.* at 108-11.

### B.    The Reinsurance Policy.

The Reinsurers issued a reinsurance slip (the "Slip") to ICIM which provided a $10 million limit of liability as a proportionate share of the $35 million excess of $65 million reinsurance layer for the ICIM Policy. The Slip contained a choice of law clause, stating it "shall be governed by and construed in accordance with the law of New York[.]" (Doc. 1-4 at 4.)

### C.    The Underlying Insurance Matter.

During the policy period, the Policyholder entered into an acquisition and acquired sponsorship and management of certain funds. Due to the acquisition, the Policyholder determined that it needed to restate certain prior financial statements provided to the Office of the Chief Accountant ("OCA") of the Securities and Exchange Commission ("SEC") for certain funds and prior reporting periods (the "Restatement Matter"). The Policyholder retained legal counsel to seek a coverage determination under the ICIM Policy for payments that it made in connection with the Restatement Matter.

In October 2021, the Policyholder, through its counsel, reported to ICIM that it had incurred "Costs of Correction" in connection with the Restatement Matter. ICIM retained counsel to investigate whether the Restatement Matter was covered by the ICIM Policy. After an approximate eighteen-month investigation, during which ICIM's counsel "reviewed thousands of pages of documents furnished by [the Policyholder's] coverage counsel, engaged in multiple conferences with [the Policyholder's] coverage counsel, interviewed senior officers of [the Policyholder][,] and engaged in extensive factual and legal research[,]" (Doc. 16-1 at 14), ICIM and its counsel determined that it was obligated to pay the Policyholder the full limit of liability under the ICIM Policy. Thereafter, ICIM asked the Reinsurers to pay their respective shares of the reinsured amount under the Slip. The Reinsurers opposed this request because they disagreed with ICIM's coverage determination and contended that the Restatement Matter was excluded

3

by the Prior Acts Exclusion clause of the ICIM Policy.

## D.    The Selection of an Arbitrator and Submission of Position Statements.

On November 3, 2023, ICIM served a demand for arbitration on the Reinsurers. In arbitration, ICIM sought to recover from each of the Reinsurers under the Slip, "and, in addition, their proportionate shares of ICI[M]'s loss adjustment expense." (Doc. 1-9 at 2.) ICIM also requested "an award of its fees and expenses incurred in pursuing [] arbitration, including but not limited to attorney['s] fees, arbitrator fees, and other arbitration expenses." *Id.* ICIM proposed three individuals to serve as the arbitrator, and on December 1, 2023, from the three, the Reinsurers agreed to select Andrew Maneval as the sole arbitrator (the "Arbitrator").

On January 25, 2024, the parties submitted their position statements to the Arbitrator. In their position statement, the Reinsurers argued that the Slip "do[es] not contain a 'follow the fortunes' clause, and for that reason the Reinsurers are not obligated to simply pay any and all claims paid by ICI[M] under the ICIM Policy." (Doc. 1-11 at 4.) The Reinsurers asserted that the Restatement Matter was excluded from coverage under the ICIM Policy's Prior Acts Exclusion clause and they were not obligated to pay for the Policyholder's claim. The Reinsurers framed the issues for arbitration as follows: "(1) are the Reinsurers obligated to follow the claims decision made by ICI[M]; and, if not, (2) does the Prior Acts Exclusion [clause] in the ICIM Policy preclude coverage for the Restatement Matter?" *Id.*

In its position statement, ICIM countered that, because the Slip provides "the [R]einsurer[s] 'shall pay as may be paid thereon[,]'" its "plain language . . . expressly required [the Reinsurers] to follow the settlements [('FTS')] of ICI[M]." (Doc. 1-12 at 12.) ICIM argued, "it is ICI[M]'s position that [the Reinsurers] are obligated to follow ICI[M]'s good-faith settlement of the Restatement Matter claim – both as a matter of express [Slip] language and reinsurance industry custom and practice – and that ought to be the end of this dispute." *Id.* at 12. In the alternative, ICIM claimed that, even if the Reinsurers had no obligation to follow its settlements, "none of the arguments that [the Reinsurers] have raised as to why ICI[M] should have denied the Restatement Matter

4

claim justifies [their] refusal to indemnify ICI[M]." *Id.* at 13.

### E.    The Arbitrator.

On February 1, 2024, the parties attended an organizational meeting, during which the Arbitrator disclosed any potential biases or conflicts. The Arbitrator provided his CV, which indicated that he was certified as an arbitrator by ARIAS U.S. and had served "as an expert/expert witness in approximately [eighteen] insurance/reinsurance industry cases." (Doc. 15-6 at 3.) According to his CV, the Arbitrator served as a President, Chief Operating Officer, and Senior Vice President of various insurance and reinsurance companies owned by The Hartford Financial Services Group, Inc., including acting as President and Chairman of the Board of Directors of First State Insurance Co., New England Reinsurance Corp., and New England Insurance Co. The Arbitrator had "served as Arbitrator or Umpire in over 170 industry arbitrations" and "[s]erved as outside attorney to numerous insurance and reinsurance companies, counseling on various legal and regulatory issues, and representing them in many arbitrations, litigations, regulatory proceedings, and mediations." *Id.* The parties accepted the Arbitrator and apparently did not request a more comprehensive disclosure.

In October 2024, the Reinsurers discovered that the Arbitrator had provided expert witness testimony in a reinsurance case, *Munich Reinsurance America, Inc. v. Utica Mutual Insurance Co.*, 2018 WL 9979192 (N.D.N.Y July 24, 2018). In his testimony, the Arbitrator stated in relevant part:

> I think the same general circumstances that pertain to the follow[]the[]settlements or follow[]the[]fortunes concept apply generally equally, obviously there's some distinctions[,] but in general, the overall purpose applies in the same way. The overall purpose is to assure that the insurance and reinsurance industry can work effectively and commercially and prudently by requiring and expecting reinsurers to defer to reasonable good faith settlement decisions or payment decisions or interpretations of their own policies, in order to provide both the right and allow for the obligation for those companies to address their insurance obligations according to the policies that they've issued, and that applies, of course, to facultative as much as it does to any other type of reinsurance.
>
> If reinsurers could, on some *de novo* basis, readjust, reconsider, or argue each of their own points of view about what their cedent's underlying

policies did or didn't cover, or whether their settlements of those, assuming they were reasonable and in good faith, if they could question and contest those, you would, first of all, have a very different reinsurance marketplace, and second, you would have some direct and meaningful interference with insurance companies' duties both contractually, statutorily, regulatorily, to observe its own duties to its insured, and its duties to manage on its own behalf, and on behalf of its reinsurers, generally, the insurance obligations. Especially when you have multiple reinsurers, you could have a total cacophony of different objections and grounds and issues coming at a ceding company that would just interrupt its ability in most cases ever to even settle with an underlying insured, if there was any significant reinsurance involved.

FTS presupposes that the reinsurers are going to understand that the manner in which the insurer, ceding company, estimates . . . and understands its own exposure, deals with that exposure, either by paying the loss, by contesting it in some manner and ultimately by settling it either by payment or compromise, or even as some court I think said, by capitulation, . . . no matter how it gets addressed, as long as the ceding company has acted reasonably and in good faith in determining those things, then each of its reinsurers will understand that that's a matter to which deference is required and which it needs to accept.

My experience is that while some industry members would not consider it appropriate to imply or impute the concept of [FTS] into reinsurance contracts, the industry custom and practice is to impute such a provision into all reinsurance contracts, absent a specific intention expressed by the parties to exclude it.

I think the custom and practice is to apply the central term or concept of [FTS], which is this deference to reasonable claims determinations. . . . [O]ther things . . . that other people might ascribe to it might not be imputed or implied or expected, but in the business of reinsurance as it's conducted on an everyday basis, you don't expect ever to have your reinsurer come in and say you can and should have settled this case differently and we can raise that *de novo* and too bad for you. I believe that is implied and that's why you have the custom and practice, in my view.

(Doc. 1-1 at 11-12) (alterations adopted) (emphasis and citation omitted).

The Reinsurers also discovered the Arbitrator's expert testimony in *Utica Mutual Insurance Co. v. Century Indemnity Co.*, 2019 WL 9044711 (N.D.N.Y. Sept. 20, 2019). During the Arbitrator's testimony therein, the following discussion transpired:

A. Whipsawing is a concept in reinsurance that reflects the danger that's

6

posed to an insurance company of having different reinsurers or even a single reinsurer making arguments against what were reasonable underlying settlements, whereby on either side of the saw, as it were, the ceding company is go[ing to] lose because it now has to confront what one or a series of different reinsurers argue[] against what its own interpretation of its own policies were.

Q. Is there a concept in the custom and practice—what is the way in the custom and practice that [the] whipsawing concern[] is dealt with?

A. That's the nature and foundation of the [FTS] doctrine which requires the reinsurer to follow the decisions made in good faith that are reasonable . . . that the insurer has made with respect to its own policies and its own settlement of the loss with the insured.

*Id.* at 12 (alterations adopted) (emphasis and citation omitted).

On October 16, 2024, the Reinsurers, through their counsel, emailed the Arbitrator and ICIM stating:

It has recently come to our attention that you previously testified as an expert witness on at least two separate occasions that it is industry custom and practice to impute "follow the fortunes" clauses into all reinsurance contracts. This expert testimony was not revealed in your disclosures. In [the Reinsurers'] view, under the ARIAS-US Code of Conduct, it was incumbent on you to disclose relevant positions taken by you in prior expert testimony.

In this arbitration, [the Reinsurers] intend to present fact and expert evidence to support their case that the reinsurance contract at issue does not contain a "follow the fortunes" or "[FTS]" provision, and it would be inconsistent with custom and practice in the reinsurance industry to imply such clauses into this contract. [The Reinsurers] understand that inadvertent omissions can occur. Nevertheless, to preserve the integrity of the process, and because we are obliged to raise any potential bias or conflict of which we become aware so as to preserve all rights, [the Reinsurers] ask that you carefully consider whether your prior opinions, as expressed in your past expert testimony, would inhibit your ability to act and decide the issues that will be presented to you in this arbitration fairly and impartially. In the meantime, [the Reinsurers] reserve all rights.

(Doc. 1-14 at 2) (internal citations omitted).

ICIM responded stating that it "does not see any need for [the Arbitrator's] withdrawal" because "(1) [the Reinsurers] have not requested [the Arbitrator's] withdrawal; (2) [the Reinsurers] were not prejudiced by any delay in disclosures; and (3)

[a]s far as ICI[M] is aware, no provision in the ARIAS-U.S. Code of Conduct calls for [the Arbitrator] to withdraw." (Doc. 1-15 at 2.) The Reinsurers replied to "reiterate and clarify" their position as follows:

- [The Reinsurers] agreed to select [the Arbitrator] as sole arbitrator from a list of proposed arbitrator candidates supplied by [ICIM].

- Following the parties' selection of [the Arbitrator] as the sole arbitrator, [the Reinsurers] understood that[,] in accordance with ARIAS rules[,] any necessary disclosures (including with regard to expert testimony) would be made before [the Arbitrator] accepted the appointment.

- Once [the Reinsurers] became aware of [the Arbitrator's] expert testimony on imputing "follow the fortunes" clauses into all reinsurance contracts, it was incumbent on [the Reinsurers] to ask that [the Arbitrator] carefully consider whether [his] prior opinions as expressed in [his] expert testimony would inhibit [him] from deciding the issues in this arbitration fairly and impartially.

- [The Reinsurers] are of the view that it would be improper and discourteous to insist on [the Arbitrator's] withdrawal. Rather, [the Reinsurers] are looking to [the Arbitrator] for [his] considered views on this important issue.

(Doc. 1-16 at 1-2.)

The Arbitrator responded to the parties' arguments on November 1, 2024, explaining his failure to disclose his prior expert testimony as follows:

When I first reviewed the [p]osition [s]tatements in this arbitration, I considered the several expert reports that I had authored in other cases. I . . . concluded that making such disclosures would: (a) not be required or appropriate; and (b) might be confusing or lead to unnecessary complexities, explanations, and distinctions regarding claims and defenses that were discussed in the parties' [p]osition [s]tatements.

(Doc. 1-17 at 2.) The Arbitrator conceded that, "[i]n several prior expert reports, I have opined on the issue of the 'imputation' of 'follow the fortunes' or '[FTS]' provisions in facultative reinsurance contracts, indicating, in general, that I believe that the industry custom is to consider these provisions to be imputed" but concluded that such testimony did not hinder his ability to impartially decide the dispute for arbitration. *Id.* at 3. The Arbitrator reasoned:

Both sides, in their [p]osition [s]tatements, have made some reference to

8

a[n] "[FTS]" principle being imputed – or not being imputed – into the [Slip]. More significantly, however, both sides have made reference to the actual [Slip] language that required the parties to "follow the terms, clauses, exceptions, warranties[,] and conditions as per the original policy . . . and shall pay as may be paid thereon, subject, however, to the terms and conditions of the agreement." This is *not* a[n] "FTS" clause. While there may be some differences of opinion about the full context and meaning of "pay as may be paid thereon," the reinsurance cession in any event can certainly only be made for a loss that is covered by the underlying policy and not precluded by any term of the reinsurance contract. These questions of policy coverage – including (but not limited to) the Prior Acts Exclusion of the [ICIM P]olicy – are the subject matter of this dispute, not any mere "presumption" about the reasonab[leness] (etc.) of the settlement . . . .

It bears noting here that [the Reinsurers] have indicated that they maintain their "ability to challenge whether coverage under the [Slip] is available for matters presented for coverage under the ICIM Policy, as they do here." This ability exists wholly independent of any application (or non-application) of "FTS" principles[] and will be allowed. While [ICIM] indicate[s] they might challenge the [Reinsurers]' rights to a "*de novo review*" of the underlying claim, it is clear that [the Reinsurers] are entitled to review the materials from that claim/settlement process, and make any and all arguments regarding the coverage, *vel non*, under the [ICIM P]olicy. As indicated above, I would never conclude that there was any effect of a[n] FTS provision that would limit the reinsurers' rights to see relevant documents, consider whether the underlying loss was properly covered by the policy, or make arguments of an improper cession based on those arguments. The effect of FTS principles is, in the presence of a good faith settlement, simply then to require the reinsurer to show that the cession or allocation was unreasonable, not covered, or otherwise flawed under the reinsurance agreement.

*Id.* at 4 (alteration adopted) (emphasis in original) (internal citation omitted). For those reasons, the Arbitrator concluded that he could be "entirely fair and impartial" in resolving the dispute and decided to "remain as the arbitrator in this proceeding." *Id.* at 4.

The Reinsurers advised the Arbitrator that the parties had conferred and agreed that "[t]here are no lingering issues on the subject of your involvement." (Doc. 15-9 at 2.)

F.    **The Arbitration Clause.**

The Slip contained an arbitration clause (the "Arbitration Clause"), which provided that "[a]ll disputes or differences arising out of or connected with this

9

agreement . . . , its interpretation or implementation, shall be referred to arbitration[.]" (Doc. 1-4 at 22, § 2(a).) With respect to selecting an arbitrator, it stated:

> The party which desires to refer a matter to arbitration ('the Claimant') shall so notify the other party ('the Respondent') in writing and[,] at the time of so doing[,] shall request the Respondent to agree as sole Arbitrator one of a list of three individuals whom the Claimant shall name. The Respondent shall, within [thirty] days of receipt of the said notice, notify the Claimant either (a) that it agrees [to] one of those three individuals as sole Arbitrator, thus completing the constitution of the Arbitral Tribunal, or (b) that it nominates another person as its own Arbitrator. If the Respondent fails to name its own Arbitrator within the time prescribed herein, then the Respondent shall be deemed to accept the Arbitrator named by the Claimant from the list as the sole Arbitrator.
>
> In the event that the Respondent nominates its own Arbitrator, the Claimant shall itself nominate its own Arbitrator within [fifteen] days of receipt by it of the Respondent's choice. The two Arbitrators so nominated shall, within [fifteen] days of the appointment of the second of them, themselves appoint a third Arbitrator to complete the constitution of the Arbitral Tribunal.

*Id.* at §§ 2(a)-(b). Regarding an arbitrator's duties, it provided:

> The Arbitral Tribunal shall interpret this agreement as an honorable engagement and not as merely a legal obligation; it is relieved of all judicial formalities and may abstain from following the strict rules of law, and shall make its award with a view to effecting the general purpose of this agreement in a reasonable manner with due regard to the custom and usage of the insurance and reinsurance business. To the extent the Arbitral Tribunal considers substantive law, New York law will apply.

*Id.* at 22-23, § 3.

The Arbitration Clause stated that "[t]he Arbitral Tribunal shall [] have full discretion to make such orders as it thinks fit with regard to the payment of the costs of the [a]rbitration[,] including attorney['s] costs and fees." *Id.* at 23, § 4.

### G.    The Arbitration.

#### 1.    The Reinsurers' Motion for Summary Judgment.

On December 20, 2024, the Reinsurers submitted a joint opening arbitration brief and motion for summary judgment. Therein, the Reinsurers framed the two central issues for arbitration as follows: "(1) are the Reinsurers obligated to 'follow the settlement' of ICI[M], such that ICI[M]'s coverage determination should be afforded deference; and (2)

is the Restatement Matter excluded from coverage, or was the settlement otherwise made in bad faith, fraudulent, collusive[,] or *ex gratia*?" They claimed that, in the course of arbitration, they would "show [] the answer to the first question is 'no' and the answer to the second question is 'yes.'" (Doc. 1-5 at 15.) The Reinsurers argued that the Slip did not expressly contain an FTS clause and one should not be imputed into it and that the absence of an FTS clause "place[s] the burden on ICI[M] to prove a legal liability for the Restatement Matter[,]" which ICIM could not prove as a matter of law. *Id.* at 53 (citation omitted). The Reinsurers alternatively contended that even if the Arbitrator imputed an FTS clause into the Slip, which would require "ICI[M] [to] prove its settlement was arguably covered and in good faith," and the Reinsurers to "prove the Restatement Matter was not covered, or that the settlement was in bad faith, fraudulent, collusive[,] or *ex gratia*[,]" the Reinsurers were not required to follow ICIM's coverage determination because "ICI[M] did not treat them with utmost good faith in keeping them updated on their coverage investigation and reserves." *Id.* at 53, 61.

On December 20, 2024, ICIM submitted its opening brief and opposition to summary judgment, wherein it countered that the Slip contained an FTS clause which "does not permit [the R]einsurers to conduct their own *de novo* review of coverage or of the facts of the underlying claim." (Doc. 1-7 at 35.) ICIM argued that even assuming the Slip did not contain an FTS clause, "the custom and practice in the reinsurance industry is to apply follow[]the[]fortunes principles to all reinsurance contracts unless expressly excluded by the parties." *Id.* at 37. ICIM claimed that, under FTS principles, which bind a reinsurer to coverage determinations that are "objectively reasonable and made in good faith," the Reinsurers cannot "second-guess ICI[M]'s investigation or [] coverage analysis[]" and "are foreclosed from engaging in their own *de novo* determinations of the factual circumstances of the Restatement Matter." *Id.* at 40, 42.

On January 23, 2025, the Reinsurers submitted a reply brief, stating in relevant part:

> While the parties' submissions are lengthy, the issues for the Arbitrator to decide are [straightforward] and legal in nature: . . .

11

- ***Does [the Prior Acts Exclusion clause] in the ICIM Policy preclude coverage for the Restatement Matter?*** Yes. . . .

- ***Are the Reinsurers obligated to follow the claim[] decisions made by ICI[M]?*** No. The [Slip] purposefully does not contain a "[FTS]" clause; it would be improper to impute a[n] "[FTS]" clause where the parties did not include one, particularly where ICI[M] is a risk retention group and the Reinsurers were the true risk bearers; even if a[n] "[FTS]" clause were imputed, no deference would be given to ICI[M]'s claims and settlement decision where it did not treat the Reinsurers with utmost good faith and no coverage is available.

(Doc. 1-6 at 10) (emphasis in original).

In its reply brief, ICIM again argued that FTS principles applied to the Slip, and under those principles, "[a]s long as ICI[M]'s coverage determinations were reasonable or 'arguable,' and if they were made in good faith, [the Reinsurers] are required to defer to them." (Doc. 1-8 at 20) (citations omitted). ICIM claimed that the Reinsurers could not satisfy their burden of proving that its coverage determination was unreasonable or made in bad faith.

In support of their competing positions, the Reinsurers and ICIM submitted expert witness reports. The Reinsurers' expert witness, Debra J. Hall, opined that the Slip did not contain an FTS clause but, instead, contained a "following form" clause and that, "[i]n the absence of a[n] [FTS] clause, ICI[M] should be required to demonstrate that the Restatement Matter claim was covered by *both* the [ICIM P]olicy and the [Slip]." (Doc. 1-18 at 38) (emphasis in original). She further stated that, "[i]n the absence of a[n] [FTS] clause, the reinsurer under an indemnity contract is not bound by a settlement unless the reinsured can *prove* its liability under *both* the original insurance policy and the reinsurance contract." *Id.* at 29 (emphasis in original). Ms. Hall alternatively concluded that, even if an FTS clause was applied to the Slip, "[i]t is the custom and practice in the reinsurance industry to . . . permit the Reinsurers to inquire about whether there is *reasonable* or *arguable* coverage under the original policy, or whether payment of the claim was *ex gratia*, which is 'universally' understood in the industry as beyond the obligation of a [r]einsurer's duty of indemnity." *Id.* at 38-39 (emphasis in original).

ICIM's expert witness, Ty R. Sagalow, opined that, according to the Slip's express language and the reinsurance industry's "longstanding custom and practice[,]" the Reinsurers "have no right to conduct a *de novo* review" of ICIM's coverage determination and must instead follow its settlement, "which, absent bad faith by the cedent, requires the reinsurer to follow the decision of the ceding insurer and to pay its share of what the cedent paid as provided in the [Slip]." (Doc. 1-20 at 50, ¶¶ 138-40.) Mr. Sagalow stated that, "[f]or the insurance industry to function properly, the industry requires reinsurers to follow the fortunes of the ceding insurance company, except when there is specific language in a reinsurance agreement to the contrary[]" and "[e]xcept in unusual circumstances (such as bad faith), the reinsurance company is not allowed to 'second-guess' the claim decision of the ceding insurer[.]" *Id.* at 30, ¶ 59(i). Mr. Sagalow concluded that "ICI[M] acted consistently with industry custom, practices, and standards[,]" while the Reinsurers "violated industry custom, practices, and standards and their contractual obligations by refusing to indemnify ICI[M] for each [Reinsurer]'s proportional share of the reinsurance obligation." *Id.* at 52, ¶¶ 1-2.

On January 27, 2025, the Arbitrator entered an Order denying the Reinsurers' motion for summary judgment because he found "[t]here are multiple[] genuine, material facts in dispute in this arbitration." (Doc. 1-22 at 3, ¶ 2.) In relevant part, the Arbitrator reasoned that "[w]hat type of deference, if any, the Arbitrator should give to ICI[M] in respect of its own adjustment and payment of the claim remains to be determined based on the weight and persuasiveness of the evidence to be submitted on this topic." *Id.* at 4, ¶ 6.

### 2.    The Arbitration Hearing.

Commencing on March 2, 2025, the Arbitrator conducted a nine-day evidentiary hearing which addressed, among other things, ICIM's investigation and analysis that gave rise to its coverage determination. The parties' expert witnesses testified consistent with their respective reports.

### 3.    The Interim Final Award.

On April 4, 2024, the Arbitrator issued an Interim Final Award (the "Interim

13

Award"), finding that the Slip did not expressly contain "a formal or binding 'FTS' provision[,]" that one should not be imputed into it, and thus that "[no FTS clause] applies to the [Slip] in this arbitration." (Doc. 1-26 at 5, ¶ 9.) The Arbitrator stated that, "while I agree with the Reinsurers on these two points, I do not fully agree with their conclusion about the proper method of considering and assessing [ICIM]'s underlying settlement and cession, or that the absence of any FTS provision therefore permits an absolute or enforceable right to a full *de novo* reconsideration of that settlement." *Id.* The Arbitrator reasoned:

> Under these circumstances, the Reinsurers had certain duties owed to them that ICI[M] was bound to perform. These duties included: (a) the cession of a claim that reflected a reasonable settlement of the insured's actual or potential obligations, that was determined in good faith, that was not fraudulent or collusive, and that did not constitute an "*ex gratia*" payment; (b) a professional, competent, and businesslike investigation and adjustment of the underlying loss; and (c) the right in the Reinsurers to contest the propriety of the settlement and cession in respect to all rights and duties contemplated or reflected in points (a) and (b). The absence of an FTS principle, among other things, left the burden to establish sufficient proof of the performance of items in (a) and (b), above, squarely with ICI[M].
>
> That burden, however, did not implicate, require, or even permit a full, unfettered "*de novo*" review of ICI[M]'s entire process of investigation, adjustment, and settlement. Such a review, if allowed and undertaken respecting regular reinsurance claims, would have the effect of bringing the reinsurance business to a grinding halt. Were such reviews to be allowed, settlements of insurance claims would be seriously disincentivized and discouraged, in contravention of public policy and insurance laws and regulations. While the absence of FTS provisions does strip ICI[M] of certain protections that it would otherwise have had . . . , the customs and usage of the insurance and reinsurance industry do not envision that [the] Reinsurers will perform a nuts-and-bolts, ground-up re-litigation of the underlying insurance claim adjustment that was originally performed by ICI[M]. This conclusion also serves to effect the "general purpose" of the [Slip].

*Id.* at 5-6, ¶¶ 10-11 (footnote omitted).

The Arbitrator found that "industry practice is to preclude a reinsurer's alleged right to a full, *de novo* reevaluation of a ceded claim[,]" *id.* at 5, ¶ 11 n.2, and determined

14

the proper standard to govern ICIM's coverage determination was one of reasonableness:

> As suggested by the prior section . . . , the disputed issue presented to th[e] Arbitrator is ***not*** whether the opinion of ICI[M] and its advisers, or any of the opinions expressed subsequently by the Reinsurers, is the *most* correct, or even the *more* correct, determination of such an issue. The Reinsurers' liability does not properly rest solely on a "preponderance of the evidence" (or some equivalent) standard as to how a court or other trier of fact or law would conclude that the [ICIM] Policy should be interpreted. Rather, the dispositive question on this point is whether the determination of coverage of the Restatement [Matter] by ICI[M] [was] ***a*** reasonable decision under the circumstances and in the conditions as they were presented to ICI[M]. If the conclusion reached by ICI[M] was not reasonable, then the Reinsurers would not be bound by ICI[M]'s cession to them under the [Slip]. If ICI[M]'s determination was a reasonable one, however, then (subject to other defenses . . .) the Reinsurers are obliged to indemnify ICI[M] for that loss.

*Id.* at 12, ¶ 25 (emphasis in original).

With regard to coverage, after nine days of testimony, the Arbitrator concluded ICIM's decision was "sufficiently justified, explained, and supported by the research, analysis, legal reasoning, interpretation, and judgment performed or exercised by ICI[M] and its representatives[,]" and ruled that ICIM "has met its burden to establish that the cession to the Reinsurers of the Restatement [Matter] loss was reasonable" and that ICIM "act[ed] in utmost good faith with regard to this matter." *Id.* at 13, 18, ¶ 26, 40. In doing so, the Arbitrator did not ignore the Reinsurers' arguments regarding defenses to coverage. Instead, the Arbitrator considered and discussed the parties' competing coverage positions at length:

> Over the approximately eighteen-month period between when the Restatement [Matter] [c]laim was initially noticed and when it was paid, there was a considerable amount of investigation and analysis performed by ICI[M] and its representatives regarding that claim. While [the] Reinsurers assert numerous objections regarding the motivation, focus, *bona fides*, and [] ultimate conclusion of this investigation and analysis, the adjustment process did involve ICI[M] personnel, representatives of two prominent[] outside law firms, and the assistance of a firm of accountants. At issue was whether ICI[M] was obligated to pay the Restatement [Matter] [c]laim, given the coverage provided in the [ICIM] Policy and the exclusions (and/or other legal doctrines) that might have limited or negated that

15

coverage of this claim. One of the matters most in contention was whether ICI[M] was or could be liable under the [ICIM] Policy for remediation efforts resulting from the objection expressed by . . . OCA . . . of the . . . SEC . . . on March 5, 2020[,] to the method by which the relevant master limited partnership ("MLP") Funds were and had been calculating Net Asset Values ("NAV"s), in respect to Deferred Tax Assets ("DTA"s), to the extent that such remediation was applied retrospectively to years prior to the in force period of the [ICIM] Policy.

ICI[M] submitted evidence and argument regarding its investigation, analysis, and conclusion that such coverage *was* provided by the [ICIM] Policy. In sum, ICI[M] argues that: (a) under the [Costs of Correction] section of the [ICIM] Policy, [the Policyholder] was entitled to recover such costs incurred by the Company (*i.e.*, the Insured) in excess of the applicable deductible amount, "to correct any Unrealized Liability first discovered during the [ICIM] Policy Period["]; (b) Unrealized Liability "shall mean any situation which arises from a Wrongful Act committed, in the ordinary course of the Company's operations, by the Company or by persons for whose Wrongful Acts the Company is legally responsible, which situation, if not corrected, would automatically have resulted in legal liability on the part of the Company"[;] (c) a Wrongful Act (respecting a [Costs of Correction] matter) "shall mean any Negligent Act, Error[,] or Omission committed or alleged to have been committed by the Company or by persons for whose Negligent Acts, Errors[,] or Omissions the Company is legally responsible (including employees acting within the scope of their employment)[]"[;] (d) a Negligent Act, Error[,] or Omission for relevant purposes "shall mean any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission[,] or other negligent act"; and (e) [] ICI[M]'s liability to [the Policyholder] and hence ICI[M]'s payment of the full $100 million aggregate limit under the [ICIM] Policy, for the Restatement [Matter] [c]laim fell properly within this grant of coverage.

The Reinsurers submitted evidence and argument to contravene this determination and also respecting other defenses that they claim ICI[M] should have asserted – but did not assert – against [the Policyholder.] ICI[M] alleges that these defenses were not properly available to it in determining its liability to [the Policyholder] under the [ICIM] Policy. **Hence, a central issue in this arbitration is whether the determination by ICI[M] that a payment of the full limit of liability under the [ICIM] Policy was properly owed to [the Policyholder] on the Restatement [Matter] was reasonable, reached in good faith, was neither fraudulent nor collusive, and did not constitute an *ex gratia* payment.**

ICI[M]'s claim that its settlement of the Restatement [Matter] [c]laim was

16

reasonable is based on numerous factors, including, *inter alia*, that: (a) the March 5, 2020 verbal objection by the OCA to the calculation of the NAVs would have, and did have, the effect of creating and assigning "automatic" liability to [the Policyholder] for the correction of such incorrect NAV calculations and strikings and that this liability would also "automatically" extend backwards in time for the full period that these NAVs were being incorrectly calculated (*i.e.*, that this retrospective correction was a necessary duty of [the Policyholder] in its then-current role as the investment adviser to the four newly[]created MLP funds arising from its then-present fiduciary (and also contractual) obligations to the funds); (b) this [redacted] liability "was its own going-forward liability, not a duty that it inherited or to which it succeeded and was triggered by [the Policyholder's] post-Acquisition Wrongful Acts and by no others[]"; (c) ICI[M]'s legal counsel opined that the Restatement [Matter] [c]laim, if litigated, would almost certainly be litigated in Delaware courts under Delaware law, which would be very favorable to the insured's positions and interests; (d) [the Policyholder] was represented on the Restatement [Matter] [c]laim by a highly professional and aggressive law firm; and (e) no exclusion or principle of law acted to vitiate coverage for [the Policyholder] under the [ICIM] Policy.

The Reinsurers contest many of these conclusions regarding ICI[M]'s alleged liability under the [ICIM] Policy. They assert, for example, that ICI[M] has failed to prove that the Restatement [Matter] [c]laim was founded on an "automatic liability[,]"[] or that the subject Wrongful Act was committed in the "ordinary course of [the Policyholder's] operations." Further, the Reinsurers contend that coverage was excluded pursuant to . . . the "Prior Acts Exclusion[.]" . . .

The Reinsurers contend that, on the facts in this arbitration, there was an Unrealized Liability that "involved" [redacted] and that [the Policyholder's] purported liability was "based on, arose out of, directly or indirectly resulted from, were in consequence of, or in any other way involved a Wrongful Act committed prior to [redacted]," as excluded by [the Prior Acts Exclusion]. As such, they contend that the Prior Acts Exclusion does act to exclude the Restatement [Matter] [c]laim from coverage under the [ICIM] Policy and that ICI[M] should have [] asserted this exclusion in that manner.

Various examples and/or explanations of such Wrongful Acts (*i.e.*, those committed *prior to* [redacted]) are offered by the Reinsurers as support for their defenses in this arbitration, including: (a) [redacted] as "former sponsor and manager to the MLP Funds and the parent company of the MLP Funds' manager [redacted]"[] are "unquestionably involved" in the decision by [the Policyholder] regarding how, following the acquisition

17

date, the NAVs would be calculated and struck; (b) the Prior Acts Exclusion of the [ICIM] Policy permits *separate* "Wrongful Acts" to be committed both before and after [redacted] and, if they are sufficiently linked or connected to each other (and the language of [the Prior Acts Exclusion] is very broad in this respect), then the *earlier* Wrongful Act could be the one identified in that exclusion to preclude coverage; and (c) some of these sole, or initial, Wrongful Acts could include one or more of the following: (i) a *decision* by [the Policyholder] made prior to the acquisition, to adopt the same valuation allowance ("VA") methodology that had been used by [redacted] which was inconsistent with the one then used by [redacted] for its other MLP funds; (ii) the failure of [the Policyholder] to perform a proper due diligence on the VA methodology utilized by [redacted] including but not limited to a determination not to utilize the services of the [redacted] firm . . . in that due diligence process; (iii) [redacted] committed a Wrongful Act in how it calculated and struck NAVs on the MLP Funds and [the Policyholder] became "legally responsible" for this Wrongful Act by virtue of acquiring the assets and liabilities of the acquired legacy entities; (iv) [redacted] and the MLP Funds literally remained as Insureds under the [ICIM] Policy in the same corporate form in which they existed prior to the acquisition, at which time they had committed subject "Wrongful Acts[,]"[] and/or that[,] with respect to such Wrongful Acts[,] the entities acted with a "substantial overlap in personnel pre- and post-Acquisition at these entities."

None of these initial questions, assertions, or contentions were irresponsible in the context of adjusting a reinsurance claim. Clearly, the Restatement [Matter] [c]laim involved very complex and difficult issues of fact, law, and interpretation of contract language which, among other things, gave rise to certain skepticism (which was widely[]held, initially) about coverage based on the uncontroverted fact that approximately [ninety-eight percent] of all remediation costs pertained to pre-Acquisition time periods. In turn, these facts gave rise to legitimate questions concerning coverage, the applicability of the Prior Acts Exclusion, and the Exclusion contained in Section V(M) of the [ICIM] Policy. Also, a further defense asserted by the Reinsurers in this arbitration was based on the "larger settlement" rule under Delaware law to the effect that[,] "when settlement can be allocated to covered and uncovered amounts, and the uncovered amount increases the settlement, there is no coverage for the uncovered amounts."

ICI[M] asserted numerous responses to the Reinsurers' defenses in this arbitration by way of testimonial and documentary evidence (both factual and expert). Many of ICI[M]'s assertions and conclusions were highly detailed and technical, including[,] for example[,] that the *tense* used in "is legally responsible" signifies a responsibility that could only exist at the

18

time of the action in question. ICI[M] also asserts that[,] for there to have been a "Negligent Act, Error[,] or Omission" (on which a Wrongful Act operating in the context of the Prior Acts Exclusion could be predicated), there must have been a "duty" by [the Policyholder] to the Funds pre-Acquisition, which there was not. Such a pre-Acquisition Wrongful Act had to be committed by an Insured or by persons for whose act, error, or omission an Insured is legally liable. Most fundamentally, ICI[M] contends that there was no "Wrongful Act" at all committed by [the Policyholder] in its pre-Acquisition "decision" to continue the [redacted] form of VA methodology and that the subject Wrongful Act was "committed" *solely* after the Acquisition, which then created automatic liability that extended backward in time for prior miscalculated NAVs. The OCA objection to the [redacted] NAVs, according to ICI[M], was determined based on the "evidence-based judgment" respecting the application of [Accounting Standards Codification] 740 to historical data; such judgment was not expressed (and therefore not in existence) pre-Acquisition. Also, per ICI[M]'s arguments herein, the legacy entities were different from those post-Acquisition entities named as Insureds under the [ICIM] Policy to the extent relevant to coverage and/or the exclusions and, at a minimum, any errors or omissions that arguably were "committed" pre-Acquisition were attributable to [redacted,] the party responsible for calculating and striking the pre-Acquisition NAVs, and which, indisputably, was not a named Insured under the [ICIM] Policy.

(Doc. 1-26 at 7-11, ¶¶ 14-22) (alterations adopted) (emphasis supplied and emphasis in original) (footnotes and internal citations omitted).

Based on his review of the ICIM Policy documents, the investigation of coverage, and the coverage analysis and determination, the Arbitrator concluded ICIM's coverage determination was reasonable, supported by the record, and made in good faith. Ruling that "[n]o credible, unrebutted testimony supports the conclusion that ICI[M]'s Restatement [Matter] payment was *ex gratia* in nature[,]" *id.* at 14, ¶ 31, he rejected the Reinsurers' argument that the Prior Acts Exclusion was a complete defense to coverage.

### 4.    The Final Award.

On May 15, 2025, the Arbitrator entered a Final Award (the "Final Award"), ordering the Reinsurers to pay ICIM an indemnity amount, loss adjustment expenses, pre-judgment interest, expert testimony expenses, other arbitration expenses, and the Arbitrator's fees and expenses.

**H.    The Petition to Vacate the Arbitration Award.**

On May 30, 2025, the Reinsurers filed this petition to vacate the Final Award, contending that the Final Award was predetermined by the Arbitrator's evident partiality because the Arbitrator's "failure to timely disclose his prior expert testimony before the parties agreed to his appointment prevented the Reinsurers from arbitrating in front of a fair, impartial, and neutral arbitrator." (Doc. 1 at 19, ¶ 71.)

The Reinsurers further argue that Arbitrator improperly exceeded his authority (1) "by issuing a ruling that substituted his own views of justice on *de novo* review[] and was outside the scope of the issues, arguments, and evidence presented for his determination[]"; (2) "by declining to rule on a legal issue presented by the parties— through the parties' position statements, briefs, expert reports, expert testimony, and arguments at the arbitration hearing[]" and instead "decid[ing] on his own accord that a *de novo* review is never permitted if the cedent['s] coverage determination was '*a* reasonable' decision[]"; and (3) "by assessing costs and interest on the Reinsurers after ruling that it was reasonable for the Reinsurers to proceed to arbitration to obtain additional information about the 'complicated and arcane' Restatement Matter." *Id.* at 17, ¶¶ 60-62 (emphasis in original).

The Reinsurers claim the Arbitrator manifestly disregarded the law because "he knew that—in the absence of a[n] FTS clause—the governing legal standard was whether the cedent proved the claim was covered, but he refused to apply that standard[] and instead used the FTS standard ('arguable' coverage or a reasonable coverage determination), even in the absence of a[n] FTS clause." *Id.* at ¶ 75. The Reinsurers argue that, "[a]fter [the Arbitrator] found that the Slip did not contain a[n] FTS clause, he was obligated [to] rule on the second issue submitted by the parties for arbitration: whether, on a *de novo* basis, the Restatement Matter was covered[,]" but instead, the Arbitrator manifestly disregarded the law by finding that "ICIM's coverage determination was '*a* reasonable' decision," which is a ruling "in direct contrast with New York law[.]" *Id.* at 19-20, ¶ 76.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

"It is well established that courts must grant an arbitration [] decision great deference." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). There is a "strong federal policy favoring arbitration, the enforcement of arbitration agreements[,] and the confirmation of arbitration awards." *Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir. 2001) (citation omitted). The review of arbitration awards is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) (citation omitted). As a result, in order to obtain vacatur of an arbitration award, a petitioner "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

"A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Duferco Int'l Steel Trading*, 333 F.3d at 388. "The Federal Arbitration Act ('FAA') provides four bases upon which a federal district court may vacate an arbitration award." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 108 (2d Cir. 2019). These grounds for vacatur include when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made[,]" 9 U.S.C. § 10(a)(4), and "where there was evident partiality or corruption in the arbitrators[.]" 9 U.S.C. § 10(a)(2).

"Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). "If parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Id.* at 568-69 (citation omitted). "[O]nly a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award." *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 378-79 (2d Cir. 2023) (internal quotation

21

marks omitted) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).

In addition to the grounds for vacating an arbitration award enumerated in the FAA, the Second Circuit has "held that 'as judicial gloss on the specific grounds for vacatur of arbitration awards' in the FAA, an arbitrator's 'manifest disregard' of the law . . . 'remains a valid ground for vacating arbitration awards.'" *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021) (alteration adopted) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451-52 (2d Cir. 2011)). However, "[a] litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss*, 939 F.3d at 109 (internal quotation marks omitted) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010)).

Judicial review under the manifest disregard standard is "highly deferential to the arbitral award[,]" *Duferco Int'l Steel Trading*, 333 F.3d at 389, and courts "will uphold an arbitration award under this standard so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'" *Weiss*, 939 F.3d at 109 (quoting *Schwartz*, 665 F.3d at 452). In other words, "it is a doctrine of last resort— its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco Int'l Steel Trading*, 333 F.3d at 389. Vacatur is only warranted under this standard "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Weiss*, 939 F.3d at 109 (internal quotation marks omitted) (quoting *Stolt-Nielsen S.A.*, 559 U.S. at 671).

Under the FAA, the "Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958," otherwise known as the New York Convention, governs the enforcement of arbitration awards. 9 U.S.C. § 201. "[A]ny party to the arbitration may apply to any court having jurisdiction under this chapter for an order

confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

**B.    Whether the Arbitrator Was Evidently Partial.**

The Reinsurers argue that the Final Award must be vacated due to evident partiality because the Arbitrator "failed to timely disclose—as required by the ARIAS U.S. Code of Conduct—that he had previously testified, on multiple occasions, that for the reinsurance industry to function properly, FTS is imputed into every reinsurance contract, prohibiting reinsurers from questioning cedents' reasonable coverage determinations on a *de novo* basis." (Doc. 1-1 at 25) (citations omitted). The Second Circuit "ha[s] not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information." *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28 (2d Cir. 2004) (internal quotation marks and citation omitted). Evident partiality must be established by the party asserting it by "clear and convincing evidence." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016) (internal quotation mark and citation omitted).

**1.    Whether the Reinsurers Waived Their Objection of Evident Partiality.**

"The settled law of [the Second Circuit] precludes attacks on the qualifications of arbitrators on grounds previously known but not raised until after an award has been rendered." *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998). "Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator[,] he cannot remain silent and later object to the award of the arbitrators on that ground. His silence constitutes a waiver of the objection." *Id.* (internal quotation marks and citations omitted).

The Second Circuit has held that a party waives an objection to evident partiality "where the complaining party should have known of the relationship[] or could have learned of the relationship 'just as easily before . . . the arbitration rather than after it lost its case.'" *Lucent Techs. Inc.*, 379 F.3d at 28 (internal citation omitted). Prior to selecting

23

the Arbitrator, ICIM provided the Reinsurers with the names of three arbitrator candidates. From this list, the Reinsurers could have searched the Arbitrator's name in a Lexis, Google, or ARIAS U.S. Forms search, all of which reveal the Arbitrator's prior testimony in *Utica Mutual Insurance Co.*, 2019 WL 9044711, and *Munich Reinsurance America, Inc.*, 2018 WL 9979192. In addition, the Arbitrator's CV disclosed that he served "as an expert/expert witness in approximately [eighteen] insurance/reinsurance industry cases[,]" (Doc. 16-6 at 3), but the "Reinsurers never even requested [the Arbitrator]'s CV[]" prior to his selection as the sole Arbitrator. (Doc. 16-1 at 34.) The Arbitrator's prior expert witness testimony was available through reasonably diligent investigation by the Reinsurers well before he was selected as the sole Arbitrator.

ICIM argues that the Reinsurers "again waived their assertion of 'evident partiality' in October 2024 when, after asking [the Arbitrator] about his prior expert opinions and receiving [the Arbitrator]'s explanation, they continued the arbitration without objection to his service." (Doc. 15-1 at 34.) After discovering the Arbitrator's prior expert witness testimony, the Reinsurers never formally requested his withdrawal or recusal, but instead asked him to "carefully consider whether [his] prior opinions . . . would inhibit [his] ability to act and decide the issues . . . in this arbitration fairly and impartially." (Doc. 1-14 at 2.) The Arbitrator did so. The Reinsurers advised that they were not formally requesting withdrawal because "it would be improper and discourteous to insist on [it]." (Doc. 1-16 at 2.) They do not, however, claim they were precluded from lodging and preserving an objection to the Arbitrator's impartiality. To the contrary, the Reinsurers assured the Arbitrator that "[t]here are no lingering issues on the subject of your involvement." (Doc. 15-9 at 2.) Even though the Arbitrator subsequently determined that he could arbitrate the case fairly, the Arbitrator could have withdrawn if requested by the Reinsurers and may well have done so. *See* ARIAS U.S. Code of Conduct, Canon IV, cmt. 5 ("In the event that an arbitrator is requested to withdraw by less than all of the parties, the arbitrator should withdraw [] when [certain] circumstances exist."); *see also Kiernan v. Piper Jaffray Cos., Inc.*, 137 F.3d 588, 593 (8th Cir. 1998) ("[Plaintiffs] cannot now seek to avoid their tactical decision to await the decision of the three[-

]member panel rather than seek [the arbitrator's] removal.").[3]

In summary, the Reinsurers could have discovered the Arbitrator's prior testimony before the selection process. They could have chosen a different arbitrator from ICIM's list, they could have chosen their own arbitrator, or they could have chosen to have an arbitration panel. Having selected the Arbitrator without attempting to discover his readily accessible prior expert witness testimony and without requesting his withdrawal after discovering his expert witness testimony or even raising and preserving an objection thereto, the Reinsurers waived any claim regarding his alleged evident partiality. *See Rai v. Barclays Cap. Inc.*, 739 F. Supp. 2d 364, 374 (S.D.N.Y. 2010) ("[Petitioner] had the opportunity to object[] but knowingly and voluntarily consented to continuing with the arbitration. [Petitioner] cannot remain silent about the perceived partiality[] and then later object when the [arbitration p]anel reaches a decision he dislikes. His silence constitutes a waiver of his right to object on those grounds.") (footnotes omitted), *aff'd*, 456 F. App'x 8 (2d Cir. 2011).

### 2.    Whether the Arbitrator Was Evidently Partial.

Assuming *arguendo* the Reinsurers had not waived their objection to the Arbitrator, they have failed to establish his evident partiality.

Under the FAA, a court may vacate an arbitration award when "there was evident partiality or corruption in the arbitrator[][.]" 9 U.S.C. § 10(a)(2). "Evident partiality may be found only where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Nat'l Football League Mgmt. Council*, 820 F.3d at 548 (internal quotation marks and citation omitted). Courts have also found evident partiality may exist when an arbitrator's general "statements and conduct [] imply bias." *Subway Int'l, B.V. v. Subway Russia Franchising Co.*, 735 F. Supp. 3d 332, 347

---

[3] Although, as the Reinsurers point out, "a district court cannot entertain an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an award[,]" *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (internal quotation marks and citations omitted), the Reinsurers could have requested the Arbitrator's withdrawal or recusal pursuant to the ARIAS U.S. Code of Conduct. *See* ARIAS U.S. Code of Conduct, Canon IV, cmt. 5.

(S.D.N.Y. 2024) (internal quotation marks omitted) (quoting *Ballabon v. Straight Path IP Grp.*, Inc., 2015 WL 6965162, at *7 (S.D.N.Y. Nov. 10, 2015)), *aff'd*, 2025 WL 1363870 (2d Cir. May 12, 2025).

> To determine if a party has established evident partiality, a court should assess four factors: "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding."

*Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 74 (2d Cir. 2012) (alteration adopted) (citation omitted).

"Even where an arbitrator fails to abide by arbitral or ethical rules concerning disclosure, such a failure does not, in itself, entitle a losing party to vacatur." *Id.* at 77 n.22 (collecting cases); *see also Montez v. Prudential Sec., Inc.*, 260 F.3d 980, 984 (8th Cir. 2001) ("[E]ven if [the arbitrator]'s failure to disclose had violated [an arbitration rule], 'that would not[,] by itself, require or even permit a court to nullify an arbitration award.'") (citation omitted).

The Reinsurers argue "[t]he fact that [the Arbitrator] testified, on multiple occasions, that FTS must be imputed into every reinsurance contract, such that reinsurers would never be entitled to a *de novo* review, is clear and convincing evidence of bias." (Doc. 1-1 at 27) (citation omitted). This overstates the Arbitrator's prior testimony, in which he stated that "the industry custom and practice is to impute [] a[n] [FTS] provision into all reinsurance contracts, *absent a specific intention expressed by the parties to exclude it*[]" because "[i]f reinsurers could, on some *de novo* basis, readjust, reconsider, or argue each of their own points of view about what their cedent's underlying policies did or didn't cover, . . . you would . . . have a very different reinsurance marketplace, and . . . you would have some direct and meaningful interference with insurance companies' duties" and "you don't expect ever to have your reinsurer come in and say you can and should have settled this case differently and we can raise that *de novo* and too bad for you." *Id.* at 11 (emphasis supplied and omitted)

26

(citation omitted).

In *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC* ("*STMicroelectronics*"), 648 F.3d 68 (2d Cir. 2011), the Second Circuit rejected the respondent's argument that the arbitrator's prior testimony indicated bias and found no misconduct on the part of the arbitrator warranting vacatur under 9 U.S.C. § 10(a)(3). In so ruling, the Second Circuit explained:

> [T]he major premise of [the respondent]'s attack on [the arbitrator]'s non-disclosure of his prior testimony fails. There is no contention here that [the arbitrator] had any prior knowledge of, or misconception about, the facts of this case. [The respondent]'s argument, rather, is that his testimony suggests he had pre-existing views about potentially relevant propositions of law. However, "a judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law." *Repub. Party of Minn. v. White*, 536 U.S. 765, 777 . . . (2002). This is all the more true for arbitrators, "the most sought-after" of whom "are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose." *Int'l Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 552 (2d Cir.1981). [The arbitrator] played that very role on this panel, as the "non-public arbitrator" specifically chosen for his industry connection. It would be strange if such an arbitrator were forced to search the record of all prior testimony for any statement that might—however tangentially—relate to any of the many legal issues that might arise in any given case. A party might like to know that information when shopping for arbitrators, but its absence cannot form a ground for vacating an arbitral award.

*Id.* at 77 (alterations adopted) (footnote, emphasis, and internal citation omitted).

Although *STMicroelectronics* involved 9 U.S.C. § 10(a)(3) rather than evident partiality, the Second Circuit's rationale applies with equal force here. Because an arbitrator's failure to disclose prior testimony "cannot form a ground for vacating an arbitral award[,]" *STMicroelectronics*, 648 F.3d at 77, the Arbitrator's prior testimony regarding FTS clauses cannot provide a basis to find evident partiality, especially where, as in the instant case, the Arbitrator did not impute an FTS clause into the Slip.[4]

---

[4] The Reinsurers cite *Dealer Comput. Servs., Inc. v. Michael Motor Co.*, 761 F. Supp. 2d 459,

For the foregoing reasons, the Reinsurers' petition to vacate the Final Award on grounds of evident partiality is DENIED.

### C.    Whether the Arbitrator Exceeded the Scope of His Authority.

Under the FAA, a court may vacate an arbitration award when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). "The Second Circuit has 'consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4).'" *Caremark, L.L.C. v. New York Cancer & Blood Specialists*, 740 F. Supp. 3d 340, 352 (S.D.N.Y. 2024) (quoting *T.Co Metals, LLC*, 592 F.3d at 342).

"Objections to an award on the grounds that the arbitrators exceeded their authority are narrowly applied, and the focus of the judicial inquiry is 'whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue.*'" *A&A Maint. Enter., Inc. v. Ramnarain*, 982 F.3d 864, 868-69 (2d Cir. 2020) (emphasis in original) (quoting *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)). "[I]n considering a [§] 10([a])(4) challenge, 'the principal question for the reviewing court is whether the arbitrator's award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free merely to dispense his own brand of industrial justice.'" *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009) (alteration adopted) (citation omitted).

"[A]n arbitrator may exceed [his] authority by, first, considering issues beyond

---

462 (S.D. Tex. 2010), *vacated and remanded*, 485 F. App'x 724 (5th Cir. 2012) in support of their argument that courts find "an arbitrator's statements, conduct, or prior undisclosed relevant work[]" can indicate evident partiality. (Doc. 27 at 21.) In *Dealer Computer Services, Inc.*, the court found evident partiality existed when an arbitrator previously served on an arbitration panel for one of the parties. The court reasoned that "[the arbitrator]'s prior experience serving on the [prior] arbitration panel creates a strong impression that she had already decided disputed issues in the [subsequent a]rbitration before it began" and the arbitrator's "prior exposure to the legal issues and witnesses involved in the [prior] arbitration creates a reasonable impression that she had prejudged at least some of the issues in the [subsequent] arbitration." *Id.* at 465. None of these concerns are present in the instant case.

those the parties have submitted for [his] consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 646 F.3d at 122. "The scope of authority of arbitrators generally depends on the intention of the parties to an arbitration[] and is determined by the agreement or submission." *Loc. 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992) (alteration adopted) (internal quotation marks and citations omitted). A court should find an arbitrator acted within his authority "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority[.]" *Jock*, 646 F.3d at 122 (internal quotation marks omitted) (quoting *ReliaStar Life Ins. Co. of N.Y.*, 564 F.3d at 86).

1.      **Whether the Arbitrator Exceeded the Scope of His Authority by Declining to Conduct a *De Novo* Review of ICIM's Coverage Determination.**

The Reinsurers argue that the Arbitrator exceeded the scope of his authority by "rul[ing] that a reinsurer is never permitted a *de novo* review of [a] cedent's coverage determination[]" when "[t]he parties' position statements, briefs, expert reports, expert testimony, and arguments at the hearing[] specified that, if [the Arbitrator] determined the Slip did not contain a[n] FTS clause, he was to determine, on a *de novo* basis, whether the Restatement Matter was covered." (Doc. 1-1 at 19, 21) (emphasis omitted). The Reinsurers claim that the Arbitrator improperly "reject[ed] [] the issues presented for [his] determination[]" and "substitut[ed] his own views of justice as to *de novo* reviews, [which was] outside of the issues, arguments[,] and evidence presented for his determination." *Id.* at 19, 21.

Courts in the Second Circuit "ha[ve] made clear that the arbitrator should address the 'real substance' of the parties' dispute regardless of the precise way in which the parties had previously framed the issue." *Ragusa v. ACME Mkts., Inc.*, 2025 WL 1446893, at *6 (S.D.N.Y. May 20, 2025) (quoting *A&A Maint. Enter., Inc.*, 982 F.3d at 869).[5] Indeed, "the Second Circuit has squarely rejected arguments 'focusing

---

[5] *See also Miss Universe L.P., LLLP. v. Monnin*, 952 F. Supp. 2d 591, 601 (S.D.N.Y. 2013)

unnecessarily on form over substance' in the arbitration context[.]" *Id.* (quoting *A&A Maint. Enter., Inc.*, 982 F.3d at 869). "Any issue that is 'inextricably tied up with the merits of the underlying dispute' may properly be decided by the arbitrator." *Dighello v. Busconi*, 673 F. Supp. 85, 87 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir. 1988) (citations omitted). Courts in the Second Circuit typically find an arbitrator exceeds the scope of his or her authority only when the arbitrator decides an issue expressly excluded by the parties,[6] or when the arbitrator awards unrequested relief.[7]

In this case, the parties' arbitration submissions focused on whether the Slip contained an FTS clause or whether one should be imputed into it, whether the Reinsurers were entitled to a *de novo* review, and whether ICIM's coverage determination should be affirmed. The Arbitrator determined that the Slip did not contain an express FTS clause and that one should not be imputed into it but nonetheless

---

("[E]ven where a specific claim is not asserted in extreme detail in the original [s]tatement of [c]laim, it remains within the arbitration's scope, so long as the issue is generally submitted to arbitration[.]") (citations omitted); *Petersen-Dean, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2020 WL 635665, at *4 n.2 (S.D.N.Y. Feb. 11, 2020) ("Arbitrators . . . 'are not limited to resolving disputes by simply choosing between two options presented by the parties. Rather[,] they are often required to use their judgment and to craft a different remedy.'") (alterations adopted) (citation omitted).

[6] *See, e.g., Katz v. Feinberg*, 290 F.3d 95, 96 (2d Cir. 2002) (affirming the district court's finding that the arbitration panel exceeded the scope of its authority by determining the purchase price valuation because "the parties' [p]urchase [a]greement committed review of the valuation determination to the [c]ompany [a]ccountants, not the arbitration panel[]"); *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 177 (2d Cir. 1998) (stating that the arbitration panel would have exceeded the scope of its authority by deciding the issue of patent validity because the parties "expressly excluded [that issue] from the arbitration[]").

[7] *See, e.g., Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) ("Since the arbitrators were not entitled to award punitive damages due to the choice-of-law provision in the parties' [a]greement, . . . the [arbitration p]anel exceeded its authority in awarding punitive damages."); *Magid v. Waldman*, 2022 WL 571424, at *2 (2d Cir. Feb. 25, 2022) (affirming the district court's finding that the arbitration panel exceeded the scope of its authority by awarding a party attorney's fees for enforcement proceedings because "[t]here is no evidence that [the party] requested fees for subsequent enforcement proceedings"); *Lanesborough 2000, LLC v. Nextres, LLC*, 2024 WL 3914523, at *12 (S.D.N.Y. Aug. 15, 2024), *on reconsideration in part*, 2025 WL 785071 (S.D.N.Y. Mar. 12, 2025) (finding the arbitrator exceeded the scope of his authority by awarding attorney's fees because, in the arbitration agreement, "the parties agreed that each of them would pay its own attorney['s] fees in the arbitration").

concluded that, consistent with "the customs and usage of the insurance and reinsurance industry" and "the 'general purpose' of the [Slip][,]" the Reinsurers were not entitled to an unfettered *de novo* review. (Doc. 1-26 at 6, ¶ 11.)

Throughout the arbitration, ICIM argued that the Reinsurers were not entitled to a *de novo* review because, among other things, the "reinsurance industry custom and practice" does not entitle a reinsurer to re-investigate a claim and make its own coverage determination. (Doc. 1-12 at 12.) Although the Reinsurers contend "the parties agreed that, in the absence [of] a[n] FTS clause, [the Arbitrator] was to determine whether ICIM established the Restatement Matter was covered (*i.e.*, a *de novo* review)[,]" (Doc. 1-1 at 19), the parties did not reach an agreement on this point. Indeed, the Reinsurers, themselves, did not frame the issues for arbitration this way. Instead, in their opening brief and motion for summary judgment, the Reinsurers presented the issues for arbitration as: "(1) are the Reinsurers obligated to 'follow the settlement' of ICI[M], such that ICI[M]'s coverage determination should be afforded deference; and (2) is the Restatement Matter excluded from coverage, or was the settlement otherwise made in bad faith, fraudulent, collusive[,] or *ex gratia*?" (Doc. 1-5 at 15.)[8] The Arbitrator answered each of these questions.

The Arbitration Clause authorized the Arbitrator to "interpret this agreement as an honorable engagement[,]" relieved him "of all judicial formalities and . . . strict rules of law," and required him to "make [his] award with a view to effecting the general purpose of this agreement in a reasonable manner with due regard to the custom and usage of the insurance and reinsurance business." (Doc. 1-4 at 22-23, § 3.) When arbitration clauses

---

[8] The Reinsurers' position statement similarly asked, "are the Reinsurers obligated to follow the claims decision made by ICI[M][?]" (Doc. 1-11 at 4.) In its opposing position statement, ICIM characterized the Reinsurers' position as "boil[ing] down to their insistence on second-guessing the expertise of ICI[M] . . . as to how to handle a large and complex insurance claim submitted by a mutual fund manager. Neither the [Slip] nor industry custom and practice permits [the Reinsurers] to do that." (Doc. 1-12 at 12.) In its opening arbitration brief, ICIM argued that, "even if New York Law provided that the follow[]the[]fortunes doctrine could not be imputed into contracts, the reinsurance industry's approach is to apply follow the fortunes absent clear language to the contrary." (Doc. 1-7 at 39.)

31

contain honorable engagement language and relieve an arbitrator of adherence to judicial formalities and strict rules of law, "[c]ourts have read such clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate." *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 261 (2d Cir. 2003).[9]

During the Arbitrator's evidentiary hearing, he considered the parties' and their expert witnesses' competing views as to whether imputing an FTS clause and engaging in a *de novo* review was appropriate. He did not find, as the Reinsurers contend, that "a reinsurer is never permitted a *de novo* review[.]" (Doc. 1-1 at 19.) Rather, the Arbitrator concluded that imputing an FTS clause was inappropriate because the Reinsurers had the right to "a professional, competent, and businesslike investigation and adjustment of the underlying loss[,]" yet engaging in a full[-]scale *de novo* review was equally inappropriate because the Reinsurers were not entitled to a "full, unfettered '*de novo*' review of ICI[M]'s entire process of investigation, adjustment, and settlement[]" or a "nuts-and-bolts, ground-up re-litigation of the underlying insurance claim adjustment that was originally performed by ICI[M]." (Doc. 1-26 at 5-6, ¶¶ 10-11.) The Arbitrator reasoned that his middle ground approach served to effect "the 'general purpose' of the [Slip]." *Id.* at 6, ¶ 11.

The Arbitrator further found ICIM had established that its coverage determination was reasonable and was not a voluntary payment excluded by policy defenses. After

---

[9] *See, e.g., Harper Ins. Ltd. v. Century Indem. Co.*, 819 F. Supp. 2d 270, 280 (S.D.N.Y. 2011) ("Having improperly imposed their own terms into the contract, [Petitioners] cannot reasonably complain that the arbitrators, with the mandate of an honorable engagement clause, constructed a remedy in an effort to even the balance of power and ensure that the contract will be performed properly going forward."); *Starr Indem. & Liab. Co. v. G&G Underwriters, LLC*, 2021 WL 3500957, at *2 (S.D.N.Y. Aug. 9, 2021) ("The 'honorable engagement' language in the agency agreement's arbitration provision is nearly identical to that in *Banco de Seguros* and reflects an intention to grant the arbitrator wide discretion in crafting remedies to effect justice in any particular case."); *Petersen-Dean, Inc.*, 2020 WL 635665, at *4 (finding the arbitration panel did not exceed its authority because "the [p]ayment [a]greement includes an 'honorable engagement' clause, which has repeatedly been interpreted to signify a hefty allocation of remedial discretion[]") (internal citation omitted).

setting forth, at length, the parties' competing coverage positions in the Interim Award, he concluded that, "[b]ased on the expansive record in this case, . . . ICI[M] has met its burden to establish that the cession to the Reinsurers of the Restatement [Matter] loss was reasonable and that ICI[M] has satisfied its various duties to the Reinsurers in connection with adjusting this claim, reporting on the claim to the Reinsurers, and otherwise acting in utmost good faith with regard to this matter." *Id.* at 18, ¶ 40.

The Arbitrator's decision was well within the scope of the Arbitration Clause. The decision did not, as the Reinsurers claim, "substitut[e] [the Arbitrator's] own views of justice as to *de novo* reviews[]" nor "insert[] [the Arbitrator's] own view that reinsurers must always defer to the cedent's coverage determination." (Doc. 1-1 at 19); *cf. Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Loc. 261*, 950 F.2d 95, 99 (2d Cir. 1991) ("[W]e conclude that the arbitral decision is not based on express or properly[]implied terms, but rather was improperly based upon the [arbitration p]anel members' particular notions of industrial justice.") (citation omitted).

For the foregoing reasons, the Reinsurers' petition to vacate the Final Award on grounds that the Arbitrator exceeded the scope of his authority is DENIED.

### 2. Whether the Arbitrator Exceeded the Scope of His Authority by Assessing Costs and Interest Against the Reinsurers.

The Reinsurers argue that the Arbitrator exceeded his authority "by assessing costs and interest on the Reinsurers after ruling that it was reasonable for the Reinsurers to proceed to arbitration to obtain additional information about the 'complicated and arcane' Restatement Matter." (Doc. 1-1 at 22) (citations omitted).

The Arbitration Clause states that "[t]he Arbitral Tribunal shall [] have full discretion to make such orders as it thinks fit with regard to the payment of the costs of the [a]rbitration[,] including attorney['s] fees and costs." (Doc. 1-4 at 23, § 4.) In its demand for arbitration, ICIM sought the Reinsurers' "proportionate shares of ICI[M]'s loss adjustment expense[]" and "attorney['s] fees, arbitrator fees, and other arbitration expenses." (Doc. 1-9 at 2.) By awarding attorney's fees, arbitration costs, and interest to ICIM, the Arbitrator properly acted within his scope of authority as provided by the

Arbitration Clause and ICIM's arbitration submissions. *See Banco de Seguros del Estado,* 344 F.3d at 262.[10]

The Reinsurers' petition to vacate the Final Award on grounds that the Arbitrator exceeded the scope of his authority by awarding ICIM costs and interest is therefore DENIED, and ICIM's cross-petition to confirm the Arbitrator's award of costs and interests is GRANTED.

### D.    Whether the Arbitrator Manifestly Disregarded the Law.

The Reinsurers contend that the Arbitrator manifestly disregarded the law "because he knew that—in the absence of a[n] FTS clause—the governing legal standard was [a *de novo* review of] whether [the] cedent proved the claim was covered under both the insurance and reinsurance contracts, but he refused to apply that standard, instead using the FTS standard ('arguable' coverage or a 'reasonable' coverage decision), even in the absence of a[n] FTS clause." (Doc. 1-1 at 28) (citations omitted).

"The 'manifest disregard' test requires 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir. 1997) (citation omitted). "[A] movant must establish more than a mistake of law on the arbitrator's part. A mere error of law or the failure of the arbitrators to understand or properly apply the law is insufficient." *Success Sys., Inc. v. Maddy Petroleum Equip., Inc.,* 316 F. Supp. 2d 93, 99 (D. Conn. 2004) (citation omitted). Courts "will confirm the award if [they] are able to discern any colorable justification for the arbitrator's judgment, even if that reasoning [is] based on an error of fact or law." *Westerbeke Corp. v. Daihatsu Motor Co.,* 304 F.3d 200, 212 n.8 (2d Cir. 2002). Manifest disregard of law "is a 'severely limited' doctrine[]" which "gives extreme deference to arbitrators." *Wallace v. Buttar,* 378 F.3d 182, 189 (2d Cir. 2004) (internal quotation

---

[10] The Reinsurers contend that the Arbitrator could not assess attorney's fees and costs against them absent a finding of bad faith; however, a finding of bad faith is only required in the absence of an arbitration clause permitting an award of attorney's fees and costs. *See, e.g., Magid,* 2022 WL 571424, at *2 ("In the absence of an explicit agreement regarding fees, the arbitrator's award of fees requires a finding of bad faith.") (citation omitted).

marks and citations omitted).

"To succeed in challenging an [arbitration] award under the manifest disregard standard, a party must make 'a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.'" *Seneca Nation of Indians*, 988 F.3d at 625 (quoting *Schwartz*, 665 F.3d at 452). "In addition to this 'subjective component,' a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well[-]defined, explicit, and clearly applicable.'" *Id.* (quoting *Westerbeke Corp.*, 304 F.3d at 209); *see also Smarter Tools Inc.*, 57 F.4th at 383 ("An arbitration award manifestly disregards the law only if '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.'") (citation omitted).

The Reinsurers argue that, "[p]ursuant to New York law, absent a[n] FTS clause, a reinsurer is entitled to review the cedent's coverage determination on a *de novo* basis." (Doc. 1-1 at 29) (citations omitted). ICIM counters that "[e]ven if the arbitrator were required to apply New York law (he was not), the contract interpretation advanced by [the] Reinsurers – that reinsurers are entitled to relitigate the reinsured's coverage decisions on a *de novo* basis – is about as far from 'well-defined, explicit, and clearly applicable' as can be imagined." (Doc. 15-1 at 43 n.27.)

The Slip contained a choice of law clause providing that it "shall be governed by and construed in accordance with the law of New York[.]" (Doc. 1-4 at 4.) But importantly, it allowed the Arbitrator to refrain from strict application of New York law:

> The Arbitral Tribunal shall interpret this agreement as an honorable engagement and not as merely a legal obligation; it is relieved of all judicial formalities and may abstain from following the strict rules of law, and shall make its award with a view to effecting the general purpose of this agreement in a reasonable manner with due regard to the custom and usage of the insurance and reinsurance business. *To the extent the Arbitral Tribunal considers substantive law, New York law will apply.*

*Id.* at 22-23, § 3 (emphasis supplied).

An arbitrator cannot manifestly disregard the law when he or she is empowered by the governing agreement to disregard it and follow industry custom and practice instead. *See Starr Indem. & Liab. Co. v. G&G Underwriters, LLC*, 2021 WL 3500957, at \*2 (S.D.N.Y. Aug. 9, 2021) (finding the arbitration panel did not manifestly disregard the law "by interpreting the indemnity provision of the agency agreement, which allows for recovery of attorney's fees, to extend beyond third-party claims[]" even though "New York courts have often interpreted indemnity provisions to allow fee awards only for third-party claims[]" because "the agency agreement's 'honorable engagement' clause granted [the panel] discretion to award remedies not specifically provided for by law[]"); *St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co.*, 1997 WL 357989, at \*7 (S.D.N.Y. June 26, 1997) (finding that, "even if New York was the seat of arbitration and New York law governed, the arbitrators would be free to disregard New York substantive law[]" because the arbitration clause stated that "the arbitrators are relieved of all judicial formalities and may abstain from following the strict rules of law[]") (alterations adopted) (internal quotation marks and citations omitted), *aff'd*, 152 F.3d 920 (2d Cir. 1998).[11]

In the absence of an FTS clause, whether explicit or imputed, the Second Circuit, applying New York law, has stated, in dicta, that "the reinsurer must indemnify the reinsured only for the reinsure[r]'s *proven liability* under the reinsurance policy." *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 16 (2d Cir. 2018) (emphasis supplied

---

[11] *See also Flextronics Int'l, Ltd. v. Allianz Glob. Corp. & Specialty SE*, 809 F. Supp. 3d 170, 186 (S.D.N.Y. 2025) (finding the arbitration panel's evidentiary decisions "fell well within the broad judgment that [American Arbitration Association] Rule 35 accorded it to make admissibility determinations[]" because under Rule 35, "the arbitrators were expressly not bound by federal or state rules of evidence[]"); *In re Nw. Nat'l Ins. Co.*, 2000 WL 702996, at \*1 (S.D.N.Y. May 30, 2000) (distinguishing a case where the arbitration clause required the arbitrator to follow "the letter of New York law[]" and finding the arbitrator did not manifestly disregard the law because "[t]he arbitration clause in this case relieves the panel of 'following the strict rules of law[]'"); *In re Arb. Between Nw. Nat'l Ins. Co. & Generali Mexico Compania de Seguros, S.A.*, 2000 WL 520638, at \*9-10 (S.D.N.Y. May 1, 2000) (finding the arbitration panel did not manifestly disregard the law by "including in its award a calculation of compound rather than simple interest, as provided by [New York law]" because the arbitration clause relieved the panel "of applying the strict rules of law, or the law of any particular jurisdiction").

36

and omitted).[12] In this case, the Arbitrator pointed out the "numerous factors" ICIM relied upon in making its coverage determination and found that, after considering the Reinsurers' arguments, there were "legitimate questions concerning coverage[.]" (Doc. 1-26 at 8, 10 ¶¶ 17, 21.) After ICIM presented "numerous responses to the Reinsurers' defenses in [the] arbitration by way of testimonial and documentary evidence (both factual and expert)[,]" *id.* at 11, ¶ 22, and in light of ICIM's retention of both an outside law firm and accounting firm whose "research, analysis, and [] ultimate opinion took into account securities law and regulation, other case law, principles of insurance policy construction, positions asserted by [the Policyholder] and others, and the factual circumstances underlying ICI[M]'s purported liability under the [ICIM] Policy, including the exclusions[,]" *id.* at 12, ¶ 24, the Arbitrator concluded ICIM's coverage determination was reasonable. Against this backdrop, there was no manifest disregard of controlling precedent. *See Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1217 (2d Cir. 2002) (holding the arbitrator did not manifestly disregard the law because "[t]he resolution of the controversy in arbitration [] required application of 'an unclear rule of law to a complex factual situation[]'") (citation omitted); *Flextronics Int'l, Ltd. v. Allianz Glob. Corp. & Specialty SE*, 809 F. Supp. 3d 170, 195 (S.D.N.Y. 2025) ("The parties' agreement was not 'well[-]defined' or 'explicit' as to the meaning of the term ['best efforts].['] And the law on that point did not sharply delineate it, either. . . . The panel thus did not fail or refuse to apply a clearly defined, governing legal principle."); *Orsino*

---

[12] *But see U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 20 N.Y.3d 407, 419 (2013) ("As other courts have observed, there seems to be no good alternative to giving a measure of deference to a cedent's allocation decisions. To review each decision de novo would invite long litigation over complex issues that courts may not be well equipped to resolve, creating cost and uncertainty and making the reinsurance market less efficient.") (collecting cases); *Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F. Supp. 1328, 1350 (S.D.N.Y. 1995) ("[T]he court finds that it is customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit [FTS] clause."); *N.H. Ins. Co. v. Clearwater Ins. Co.*, 7 N.Y.S.3d 38, 48 (App. Div. 2015) (acknowledging that "the question of whether a duty of the reinsurer to 'follow the settlements' may be implied in a reinsurance contract that lacks such a provision[]" "has not yet been addressed by a New York state appellate court, has received different answers from the courts of other jurisdictions that have addressed it, and 'there is no judicial consensus on this issue'") (alteration adopted) (citation omitted).

37

*v. Countrywide Fin. Corp.*, 2011 WL 1642258, at *2 (S.D.N.Y. Apr. 20, 2011) (finding the arbitrator did not ignore well-defined, explicit, and clearly applicable law because "there [was] significant disagreement among courts in New York about" the law at issue) (alteration adopted).

For the reasons stated above, the Arbitrator provided a "colorable justification" for his decision, and no "egregious impropriety" is apparent. *Weiss*, 939 F.3d at 109 (internal quotation marks and citations omitted). The Reinsurers' petition to vacate the Final Award on grounds that the Arbitrator manifestly disregarded the law is therefore DENIED.

### E.    Whether ICIM Is Entitled to Pre-Judgment and Post-Judgment Interest.

ICIM argues that it is entitled to "pre-judgment interest at the New York statutory rate from June 6, 2025[,] to the date the [c]ourt enters final judgment in this case[]" and post-judgment interest "accruing from the date judgment is entered until payment is made." (Doc. 15-1 at 46.) The Second Circuit adheres to a "presumption in favor of pre-judgment interest[]" in arbitration awards. *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984); *see also Constr. Council 175, Util. Workers of Am., AFL-CIO v. N.Y. Paving, Inc.*, 708 F. Supp. 3d 221, 233 (E.D.N.Y. 2023) ("The Second Circuit recognizes a presumption in favor of pre-judgment interest for arbitration awards.") (citations omitted).

Although the Reinsurers rely on a case in which a court denied pre-judgment interest for an arbitration dispute because the petitioners' arguments for vacatur were not "frivolous, unreasonable[, or] groundless[,]" *Halley Optical Corp. v. Jagar Int'l Mktg. Corp.*, 752 F. Supp. 638, 640 (S.D.N.Y. 1990), this is not the standard for determining whether to grant pre-judgment interest. *See, e.g., Landmark Ventures, Inc. v. InSightec, Ltd.*, 63 F. Supp. 3d 343, 359 (S.D.N.Y. 2014) (awarding respondent pre-judgment interest because petitioner "has not made any colorable argument why [the] presumption should not be followed[]"), *aff'd*, 619 F. App'x 37 (2d Cir. 2015).

In the Interim Award, the Arbitrator granted ICIM pre-judgment interest from

38

November 9, 2022, to June 6, 2025,[13] and found that "the New York statutory rate of [nine percent] interest, applied on a simple, annual basis, will be assessed." (Doc. 1-26 at 19, ¶ 44.) "[T]he common practice among courts within the Second Circuit is to grant interest at a rate of nine percent per annum—which is the rate of pre[-]judgment interest under New York State law, N.Y. C.P.L.R. §§ 5001-5004—from the time of the award to the date of the judgment confirming the award." *Landmark Ventures, Inc.*, 63 F. Supp. 3d at 359 (internal quotation marks and citations omitted). "New York law provides for pre[-]judgment interest running from the date of an arbitration award until the entry of final judgment." *Finger Lakes Bottling Co. v. Coors Brewing Co.*, 748 F. Supp. 2d 286, 292 (S.D.N.Y. 2010). Accordingly, the court CONFIRMS the Arbitrator's award of pre-judgment interest and GRANTS ICIM pre-judgment interest from June 6, 2025, until the date that it enters final judgment in this case at a rate of nine percent per annum.

Under 28 U.S.C. § 1961(a), a court must award post-judgment interest: "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961 "do[es] not permit of the exercise of judicial discretion in its application." *Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 223 (2d Cir. 2017) (internal quotation marks omitted). In other words, "[p]ursuant to 28 U.S.C. § 1961, 'the award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered.'" *Id.* (alteration adopted) (quoting *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996)). This mandate applies with equal force to actions seeking confirmation of arbitration awards. *See, e.g.*, *Restrepo v. Nat'l Maint., Inc.*, 2024 WL 3593694, at *3 (E.D.N.Y. July 31, 2024) ("Awards of post-judgment interest under § 1961 are mandatory and apply to actions to confirm arbitration awards.") (internal quotation marks and citation omitted).

For the foregoing reasons, the court GRANTS ICIM post-judgment interest at the

---

[13] In arbitration, the Reinsurers contended that the pre-judgment interest began accruing on November 9, 2022. *See* Doc. 1-27 at 3, ¶ 2 ("The Arbitrator agrees with the Reinsurers' [] position that interest should begin to be incurred in this case starting on November 9, 2022."). The Arbitrator ordered that "[p]ayment of all amounts set forth in this Final Award shall be due from the Reinsurers on June 6, 2025." *Id.*

statutory rate under 28 U.S.C. § 1961. *See* 28 U.S.C. § 1961(a) ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average [one]-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.") (footnote omitted).

## CONCLUSION

For the reasons stated above, the court DENIES the Reinsurers' petition to vacate arbitration award, (Doc. 1), GRANTS ICIM's cross-petition to confirm arbitration award, (Doc. 16), CONFIRMS the arbitration award in its entirety, and GRANTS ICIM pre-judgment and post-judgment interest.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 14th day of April, 2026.

Christina Reiss, Chief Judge
United States District Court